Spalding, J.
We have approached the investigation of thia cause with deep solicitude, on account of the very peculiar circumstances by which it is surrounded.
It has once been determined by this court, that the respondents, Guilford, Torrence and Greene, should be held liable for the defalcation of their co-trustee, Jacob Williams, deceased, but at the instance of the defendants, a re-hearing was granted, and the case remanded to the county.
Since that time, (Dec. Term, 1846) supplemental answers have been filed, and additional testimony has been taken, which serves to explain more fully and satisfactorily the transactions of the trust.
The prominent facts are not disputed. In 1824, Thomas Hughes devised some thirty acres of land, in the outskirts of Cincinnati, to trustees, for the support of one or more schools in that city, “for the education of poor, destitute children, whose parents or guardians are unable to pay for their schooling.” The defendants Guilford and Greene, together with Jacob Williams, deceased, the acknowledged defaulter, were among the trustees named in the will. Hughes and Williams were among the first settlers of Cincinnati, and had long been *507 confidential friends. In fact, it seems to be conceded, that the foundation of this charity, so honorable to the memory of Hughes, was created by means of the active intercession of "Williams himself.
In the spring of 1827, a portion of the land, then entirely unproductive, was laid off into small building lots, and disposed of at auction, on perpetual lease, at rents varying from twelve to thirty dollars per lot. The tenants were, for the most part, from the poorer class of laborers, and consequently the collection of their quarterly rents was a business of the most irksome character. It was resolved by the trustees, at one of their first meetings, that the strictest economy should be used in the management of the fund, in order to make it available to its utmost capability, to carry into effect the benevolent purpose-of its founder. To this end, it was determined to save the expense of procuring leases to be drafted, and of employing collectors of rents, by substituting one of their own number to perform the respective duties, without compensation. Guilford swears, in his answer, that he drafted the leases for the lots first rented, and, until 1829, collected the rents without making any charge therefor.
At this time Williams was substituted for him in the capacity of collector and treasurer, and so limited was the income of the fund at that day, that in a period of six years, and up to the seventh of July, 1835, no more than $1512.37 came into his hands, for rents, pasturage and use of stone quarry, all combined.
Of this amount, Williams had disbursed the sum of $1315.-57 upon the orders of the board, mainly to defray the expense of tuition of indigent scholars in the Woodward High School. In 1837, the land which had not been subdivided, about twenty-three acres, was disposed of to one Eden B. Reeder, on a lease for ninety-nine years, renewable forever, at an annual rent of eighteen hundred dollars; and it was principally for money received by Williams on this lease, during the three succeeding years, that he became a defaulter to the trust fund j *508 for which defalcation it is sought to make his co-trustees responsible.
Before I proceed to examine the only material question in the ease, that of the liability of Guilford, Greene and Torrence,, for the default of Williams, I may be permitted to remark that, .although it be conceded by counsel for the state that these three gentlemen are of high character, and eminently qualified by education and experience, to execute the duties of the trust, yet the nature of that trust is such as to enlist in its support all the finer feelings of the heart.
It need only to be mentioned that a fund devoted to the education of “ poor, destitute children,” has been diverted from its sacred purpose, and all our generous impulses take fire at once; thé coolness of reason gives place to the warmth of passion, and we are ready to denounce all who may have contributed to what we deem a sacrilege, by either acts of commission or omission.
It will be the fixed purpose of this court to guard most vigilantly the charities created within its jurisdiction, and in no one would we regard remissness of duty in the administrators, with keener jealousy, than in the management of a fund appropriated by true benevolence, to the elevation in the scale of humanity of the poor and helpless.
But we must, in this class of eases as well as in all others, apply to the individual transaction those general rules which are the offspring of wisdom and experience, and determine, upon the particular circumstance of the case, whether those rules attach a penalty or not.
It is claimed, in the case before us, that the defendants Guilford, Greene and Torrence, (and by the term defendants, I wish for the present to be understood as including none others,) must be held responsible for the loss of $6375.81, with interest thereon from the death of Williams. And for what reason ?
The counsel say they will not controvert or “ draw in question the acts of the trustees prior to the lease to Reeder.” But *509 they claim that their conduct in yielding the whole revenues subsequent to that time, into the control of one of their number, without requiring á bond, or prescribing any mode of investment, or demanding any account, was marked by such supine indifference and gross negligence, that they must be held responsible for the loss.
The rule of responsibility which they wish applied to this case, is found in Story’s Commentaries on Equity, vol. 2, p. 517, sec. 1275: “ A trustee is to act in relation to the trust property, with reasonable diligence; and in cases of a joint trust, with due caution and vigilance, in respect to the approbation of and acquiescence in the acts of his co-trustees: for if he should deliver over the whole management to the others, and betray swpine indifference, or gross negligence, in regard to the interests of the eestuys que trust, he will be held responsible.”
The rule is cited with commendation by my learned predecessor, who pronounced the opinion of this court in 15 Ohio Rep. 593.
I recognize the rule in all its force, but while I have the author before me, shall take the liberty to extract two or three other paragraphs which I deem pertinent to the subject.
In section 1268, Judge Story says: “ In a general sense, a trustee is bound by his implied obligation, to perform all those acts which are necessary and proper for the due execution of the trust which he has undertaken. But as he is supposed merely to take upon himself the trust as a matter of honor, conscience, friendship or humanity, and as he is not entitled to-any compensation for his services, at least not without some express or implied stipulation for that purpose, he would seem, upon the analogous principles applicable to bailments, bound only to good faith and reasonable diligence ; and as in case of a gratuitous bailee, liable only for gross negligence.”
Again, in section 1280, Judge Story says further on this subject: “In cases where there are several trustees, the point has often arisen, how far they are to be deemed responsible for *510 the acts of each other. The general rule is, that they are responsible only for their own acts, and not for the acts of each .other, unless they have made some agreement by which they have expressly agreed to be bound for each other; or they have, by their own voluntary cooperation or connivance, enabled the other to accomplish some known object in violation .of the •trust.”
It was remarked by Lord Hardwicke, the great chancellor •of England, in Ex parte Belchier v. Parsons, (Ambler’s Rep. 219,) that “ these rules should not be laid down with a strictness to strike terror into mankind, acting for the benefit of •others, and not for their own; and that as a trust is an office necessary in the concerns between man and man, and which, if faithfully discharged, is attended with no small degree of trouble and anxiety, it is an act of great kindness in any one to accept it. To add hazard or risk to that trouble, and to subject a trustee to losses which he could not foresee, and consequently not prevent, would be a manifest hardship, and would be deterring every one from accepting so necessary an office.”
If we apply all these rules to the facts in the case before us, ■can there be any doubt as to the proper determination ? I am not disposed to take the ingenious counsel at his offer, and shut my eyes upon all that part of the history of this trust fund anterior to the execution of the lease to Reeder. Much valuable instruction is derived from a consideration of its inception, rise and progress. In the beginning, Williams procured his friend Hughes to make this munificent devise in his will. He had conversed with the testator touching its nature and objects, .and had named • to him those whom he considered qualified to act as trustees. If, therefore, there was one member of the board who had the special confidence of the testator more than the others, that man was Jacob Williams.
The other trustees being aware of this, and knowing the ardent zeal with which Williams sought to carry out the plan ■of benevolence which he had originated, empowered him at an *511 early day to execute, gratuitously, sundry commissions con nected with the trust.
He first superintended the laying out of the lots at the head of Main street, and the testimony shows that he exhibited as much interest in the matter as if the property was his own. He attended personally to the pasture grounds and stone quarry.
After Guilford declined the collectorship, in 1829, Williams took the irksome duty upon himself, and performed it most punctiliously for a series of years, without any reward or hope ■thereof. The rents during this time were collected as the poor tenants had the ability to pay, in some of them, five and ten dollars, amounting to about three hundred and fifty dollars per annum.
During all this period, Williams was esteemed by business men in Cincinnati to be a man of undoubted responsibility, and as to his character for probity, in the language of the witness, Judge Barnet, who knew him intimately from 1796 until his death, in 1840, “ he was reputed to be an honest, correct and upright man.”
Ought the defendants to have required a bond with sureties at the hands of Williams at any time anterior to the receipt of rents upon the Reeder lease ? He was their co-trustee, possessing character and responsibility, and performing their work gratuitously.
How was it after the execution of the lease to Reeder ? In the beginning of 1837, Reeder himself swears that he assigned this lease to McLeary & Bissell, who assigned to Greenbury Dorsy, and he becoming insolvent, assigned for the benefit of creditors.
In this posture of affairs, the co-trustees of Williams were led to believe that the rents were suffered to go unpaid, and at one time regarded the lease as forfeited for non-payment of rent. So soon as it was ascertained that Williams had any considerable sum of money in hand, they promptly and peremptorily ordered that a deposit of the same and of all mon *512 eys that should afterwards come into his hands, should be made In the trust department of the Life Insurance and Trust Company ; and this, too, although at the time Williams proposed to keep the money at six per cent, interest, and to give a mortgage to secure the same,' upon his house and lot on Main street. Subsequently, at a meeting of the trustees, Williams assured them that this order had been complied1 with, and voluntarily produced his “ bank-book ” in corroboration of what he said. By such conduct the defendants were thrown off their guard, and the loss ensued.
It is most probable that if their own private property, to an equal amount, had been thus managed by Williams, they would have taken no greater precautionary measures to insure its safety. So they swear in their answers, and I incline strongly to that belief. If this be so, these three defendants cannot be held liable for the default of their co-trustee under the rules laid down by Judge Story.
But we are at no loss for adjudged cases analogous to the one under consideration, where a defalcation consequent upon the misfortune or bad faith of one trustee was not visited upon the heads of his co-trustees.
In Attorney General v. Randall et al., M. S. Rep. Trin. Vac. 1734, where three trustees were appointed by testatrix to receive a sum of money from her executors and build an alms house in Cornwall for the maintenance of five poor women, the money was paid by the executors to one of the trustees upon the receipt of them all. The one who received the money be'came insolvent, and a loss ensued to the trust fund of £250. On a bill for account against all three of the trustees, the Lord Chancellor said: “ Suppose all the money had been lodged in a banker’s hands, bona fide, and he had failed, should the trustees have been answerable ? And if they intrust one of themselves for convenience or necessity at a time when he is solvent, which is no more than making him their banker, shall equity punish where there is no default ? and he said he saw no reason *513 why trustees may not make one of themselves their cashier where there is no fraud.”
He decreed the trustee who received the money to be alone-chargeable.
In Jones’s Appeal, 8 Watts & Sergeant’s Rep. 143, which’ was an appeal by one of two guardians, cited to settle his account, Chief Justice Gibson, in delivering the opinion of the-court, says: “ Parents, guardians, executors, receivers, and all who manage the estates of infants, are responsible as trustees, and held to the same diligence. * * * * The instances-in which a mere trustee has been charged with the defaults of his colleague, are comparatively rare. ***** q’jjg appellant, therefore, is not chargeable merely for having declined to meddle with the moneys in the first instance; and the next inquiry is, whether he ought to have interposed before he began to doubt his colleague’s solidity; or whether he ought to have been satisfied with the explanation given when he called-on him for information about the state of the property. The-result will depend very much on what is the proper degree of a trustee’s vigilance.
“ In Palmer v. Jones, 1 Vern. 184; Mann v. Ballet, Ibid 44, and Howard v. Webster, Select Ca. in Ch., 53, it is said that he is to be charged only for his own receipts, or for supine negligence, and when the proof of it is strong. * * * *
“ He inquired into the disposition made of the money, and was told by his colleague, whose truth had never been doubted, that the whole was invested in bonds, secured by a mortgage on a landed estate, which was pointed out.
“ To require him to have dealt with his colleague as a rogue, by calling for the securities, would require of him the highest and most exact vigilance ; a degree of it that would ruin every guardian. No rate of commissions would compensate the risk of such a trust, and no man of prudence would accept it. * * The principle of accountability for the omission of every meas ure of imaginary precaution which human sagacity might have *514 foreseen, would be impracticable in a country where counsel ■cannot be consulted at every step without incurring an expense •that would often .swallow up the estate. * * * Here there was reasonable vigilance and good faith, and we direct the appellant to be charged with no more than his receipts.”
We make application of all these wholesome rules of conduct to the circumstances spread before us, and, upon the whole case, both in regard to the law and the evidence, after a careful examination, we find ourselves forced to the conclusion, that upon none of the grounds which have been assumed by coun sel for complainant, are the defendants Guilford, Greene and 'Torrence, to be charged with the loss sought to be fastened upon them. They have acted with entire good faith, and with reasonable vigilance. The bill as to these three defendants and Samuel Lewis will be dismissed with costs. A decree may be taken against the administrators of Jacob Williams, for the amount found due the Hughes fund from him at the time of. his death, with interest, after deducting the sum allowed him by the court of common pleas for his services.
Caldwell, J., having been of counsel, did not sit in the case.